UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Shauna Payne,

   Plaintiff,

  v.

JetBlue Airways Corp., Steven Tenorio,

   Defendants.

20-cv-00101 (NRM) (PK)

**MEMORANDUM AND ORDER**

NINA R. MORRISON, United States District Judge:

  Plaintiff Shauna Payne works as an Inflight Crewmember at Defendant JetBlue Airways Corp. ("JetBlue"). In February 2019, Plaintiff informed JetBlue that while on a layover in San Francisco, another JetBlue Inflight Crewmember, Defendant Steven Tenorio, sexually assaulted her. Plaintiff alleged that Tenorio hugged her in an elevator at the hotel where the crew was staying, violently pulled her off the elevator, and tried to drag her to his hotel room. Upon receiving Plaintiff's complaint, JetBlue commenced an investigation. After interviewing Plaintiff, Tenorio, and other witnesses, JetBlue concluded that Tenorio did pull Plaintiff out of the elevator, but did not "substantiate" that it occurred in the violent manner that Plaintiff alleged. JetBlue then issued Tenorio an Initial Guidance and coached him on the company's Respectful Workplace Policy. JetBlue told Plaintiff that it could not guarantee that Plaintiff would not have to work with Tenorio going forward. Rather,

JetBlue stated that it would be up to Plaintiff to avoid working the same flights as Tenorio.

In January 2020, Plaintiff commenced the instant action against JetBlue and Tenorio, alleging employment discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296, New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code § 8-106, and California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940, as well as various common law tort claims under California and New York law. Defendants move for summary judgment on Plaintiff's Title VII employment discrimination claims and argue that many of Plaintiff's remaining state law claims should also be dismissed.

For the reasons to follow, the Court grants Defendants' motion in part and denies it in part. To the extent Plaintiff brings employment discrimination claims on a disparate treatment theory of discrimination, the Court holds that Plaintiff abandoned those claims and cannot proceed on them. And while there are genuine issues of material fact that preclude summary judgment as to Plaintiff's hostile work environment claims under Title VII, NYCHRL, and FEHA, the Court concludes that summary judgment is appropriate as to Plaintiff's NYSHRL hostile work environment claim and NYSHRL and NYCHRL aiding and abetting claims. Finally, the Court dismisses Plaintiff's California assault and battery claims.

## FACTUAL BACKGROUND

The Court views the following facts "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs.*, 373 F.3d 83, 89

(2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## I.    February 23, 2019 Incident

Plaintiff Shauna Payne is an Inflight Crewmember at JetBlue and is based at John F. Kennedy International Airport ("JFK").  Counterstatement of Undisputed Facts ("Rule 56.1 Counterstatement") at ¶ 2, ECF No. 71-1.  She has worked at JetBlue since 2009.  *Id.* at ¶ 3.  From about October 2015 to about March 2021, Defendant Steven Tenorio also worked as an Inflight Crewmember at JetBlue and, from 2017 to mid-2020, was based at JFK.  *Id.* at ¶¶ 4-5.

On February 22, 2019, Plaintiff, Tenorio, and two other JFK-based Inflight Crewmembers, Ronald Banks and Alyssa Forrester, worked a JetBlue flight from JFK to San Francisco International Airport ("SFO").  *Id.* at ¶ 18.  The crew had a layover in San Francisco and was not scheduled to work again until a flight back from SFO to JFK on February 24, 2019.  *Id.* at ¶ 19.  Upon arriving at SFO, Plaintiff, Tenorio, Banks, and Forrester checked into rooms at the Holiday Inn Golden Gateway Hotel.  *Id.* at ¶ 23.  Then, after settling in their rooms, Plaintiff and Tenorio met up to go out in San Francisco.  *Id.* at ¶ 26.  Banks later called Tenorio to ask to join them, and Tenorio and Plaintiff returned to the hotel to meet him.  *Id.*  Forrester declined to join the others because she was tired.  *Id.* at ¶ 24.

Plaintiff contends that while she and Tenorio were waiting for Banks to meet them in the hotel lobby, Tenorio put his head on Plaintiff's chest in a sexual manner,

3

and Plaintiff responded, "what are you doing?"  *Id.* at ¶ 30.  She further alleges that Tenorio made comments about the women in the lobby and insinuated that he wanted to have a threesome with Plaintiff.  *Id.*

Once Banks joined Plaintiff and Tenorio, the three of them went out to a late dinner.  *Id.* at ¶¶ 33–35.  After dinner, the group returned to the hotel and continued talking at a table in the hotel lobby.  *Id.* at ¶ 38.  At some point, Andy Rawlins, a Boston-based JetBlue Inflight Crewmember who was staying at the same hotel on a work-related layover, joined Plaintiff, Tenorio, and Banks in the lobby.  *Id.* at ¶ 39. The parties dispute some of the contents of their late-night conversation at the hotel. Defendants contend that the group discussed a variety of personal issues, and that Plaintiff disclosed the hurtful nature of her recent divorce, while Plaintiff contends that she stated only that she had recently gone through a divorce and that it had been a difficult transition.  *Id.* at ¶¶ 40–41.  The group continued talking until around 5:00 AM.  *Id.* at ¶ 44.

Plaintiff alleges that before departing, Banks showed the group a video on his phone of a bare breasted woman, and that Tenorio snatched the phone out of Banks's hands so he could keep watching the video.  *Id.*  She further alleges that, while they were still sitting in the lobby, Tenorio wrapped his legs around Plaintiff's legs under the table.  *Id.*  According to Plaintiff, she felt uncomfortable and pulled her legs away and stood up.  *Id.* at ¶ 47.

Plaintiff, Tenorio, Banks, and Rawlins then proceeded to the elevator, where they were joined by at least a couple of other hotel guests.  *Id.* at ¶ 50.  Plaintiff alleges

4

that, in the elevator, Tenorio hugged her tightly from behind and stated something along the lines of: "She don't know she going to my room tonight.  We are going to have some fun." *Id.* at ¶ 51.  Plaintiff further contends that, when the elevator opened at Tenorio's floor, Tenorio violently pulled Plaintiff out of the elevator by her foot, despite Plaintiff's efforts to stay in the elevator by holding onto the elevator railing. *Id.* at ¶ 52.  The parties agree that Plaintiff was laughing as she was leaving the elevator, but Plaintiff maintains that it was a nervous laughter because she was embarrassed and uncomfortable.  *Id.* at ¶ 53.

Plaintiff alleges that, once off the elevator, Tenorio squeezed her and began dragging her to his hotel room.  *Id.* at ¶ 54.  According to Plaintiff, she twisted the flesh on Tenorio's neck, which forced him to let go of her and ask why she had to be so aggressive.  *Id.* at ¶ 55.  Plaintiff alleges she then ran to the elevator and went up to her room; Tenorio did not go after her.  *Id.* at ¶¶ 56–57.

After getting back to her room, Plaintiff called her friend Cassandra Collins, who is not a JetBlue employee.  *Id.* at ¶ 58.  Collins told Plaintiff that she had a dream that Plaintiff had "rough sex with a Sagittarius man and that Plaintiff had looked disheveled."  *Id.* at ¶ 59.  Plaintiff told Collins about her night and noted that Tenorio was a Sagittarius.  *Id.* at ¶ 60.  Collins suggested that Plaintiff call the police about the incident.  *Id.* at ¶ 61.

Plaintiff then called Banks, who expressed surprise that Plaintiff was not in Tenorio's room.  *Id.* at ¶ 63.  Plaintiff alleges that Banks agreed that Tenorio had been aggressive when taking Plaintiff out of the elevator, but Banks said he did not

intervene because Plaintiff had been laughing as she and Tenorio exited.  *Id.* at ¶¶ 63–64.  Banks also told Plaintiff that he thought she and Tenorio had been flirting earlier that night and that they liked each other.  *Id.* at ¶ 65.  Plaintiff denied flirting with Tenorio, and then told Banks about her friend Collins's dream and that Plaintiff wanted to contact the police.  *Id.* at ¶ 66.  After speaking with Plaintiff, Banks called Tenorio and asked why he had treated Plaintiff that way.  *Id.* at ¶ 69.  Tenorio responded "I was just playing with her.  Did she think I was trying to rape her?"  *Id.* at ¶ 70.  Banks called Plaintiff after his conversation with Tenorio and told her what Tenorio had said.  *Id.* at ¶¶ 68–70.

Plaintiff called the San Francisco Police Department and, while she was waiting for them to arrive, called JetBlue and reported the incident with Tenorio.  *Id.* at ¶ 74.  JetBlue removed Plaintiff from the scheduled return flight from SFO to JFK, provided her with another flight home, referred the matter to JetBlue's corporate security team (called the "Blue Watch" team), and directed Plaintiff to contact her supervisor, Sonia Goodman, about the incident.  *Id.* at ¶ 75.  Plaintiff later submitted a written statement about the incident to Goodman.  *Id.* at ¶ 79.  Plaintiff then met with the police at the hotel, who took her statement, escorted her back to her room, and then left.  *Id.* at ¶ 76.  Plaintiff contends the police also unsuccessfully tried to locate Tenorio, and that Plaintiff showed the police where in the hotel the incident had occurred.  *Id.*

That same day, JetBlue's Blue Watch team called Plaintiff and asked her for more information about the incident and police report and called and spoke with the

hotel's management.  *Id.* at ¶¶ 77–78.  JetBlue also called Tenorio to conduct a wellness check.  *Id.* at ¶ 80.  Tenorio sent an email to Goodman, who was also his supervisor at the time, stating that he was alerted to the incident after receiving the wellness check and listening to his voicemails from the San Francisco Police Department.  Feb. 24, 2019 Email from Tenorio at 3, ECF No. 69-54.  In the email, Tenorio denied any kind of misconduct and said there might have been an issue when he and Plaintiff "were joking around at the end of the night in the elevator."  *Id.*

That evening, Forrester noticed that Plaintiff had been removed from the return flight and called to check in on her.  Rule 56.1 Counterstatement at ¶¶ 84–85.  After talking with Plaintiff on the phone, Forrester went to see Plaintiff in her room.  *Id.* at ¶ 85.  Plaintiff recounted the incident to Forrester and said that she was afraid to go downstairs the next day.  *Id.* at ¶ 86.  Plaintiff also asked Forrester to look for scratches on Tenorio's neck on the return flight to JFK, which Forrester agreed to do.  *Id.* at ¶ 87.

On February 24, 2019, Plaintiff returned to JFK on a separate flight.  *Id.* at ¶ 88.  When Plaintiff landed, she was met by two JetBlue supervisors at the gate who checked on her and offered her resources, including therapy.  *Id.* at ¶ 89.  Shortly thereafter, Plaintiff filed a workers' compensation claim based on physical injuries she sustained as a result of the incident with Tenorio.  *Id.* at ¶ 90.  Goodman and another JetBlue employee assisted Plaintiff with preparing and filing the claim, which appears to have been approved.  *Id.* at ¶ 91; Payne Deposition at 79:5–16, ECF No. 71-8.

## II.     JetBlue Investigation

JetBlue commenced an investigation into Plaintiff's allegations on February 24, 2019.  Investigation Report at 2, ECF No. 69-18.  Julie Paulino, a Crew Relations Field Generalist at JetBlue, led the investigation.  Rule 56.1 Counterstatement at ¶ 96.  In relevant part, the investigation report recounted Plaintiff's allegations as follows: Tenorio proposed having a threesome to Ronald Banks; in the elevator, Tenorio began to hug Plaintiff tightly and made statements alluding to having sex with him; Plaintiff tried to wiggle from Tenorio's forced embrace; Tenorio aggressively pulled Plaintiff off the elevator, which Plaintiff tried to resist, and attempted to drag Plaintiff to his room; Plaintiff grabbed the flesh of Tenorio's neck and twisted it; and Tenorio wore a scarf on the return flight to JFK to cover any scarring from the encounter.  Investigation Report at 2.  Between February 25 and March 13, 2019, Paulino interviewed Plaintiff, Tenorio, Banks, Forrester, Rawlings, and the Inflight Crewmember who replaced Plaintiff on the return flight regarding these allegations. Rule 56.1 Counterstatement at ¶¶ 99–104.

During Paulino's first interview with Plaintiff, Paulino asked whether Plaintiff spoke with Tenorio about sex or her divorce at any time during the February layover, and also asked Plaintiff about mentioning her friend Collins's dream to Banks. Plaintiff Depo. at 140–44, ECF No. 69-5.  In response to these questions, Plaintiff started screaming questions like "what does this have to do with [Tenorio] dragging me off the elevator?"  *Id.* at 144.  Paulino also asked Plaintiff about a witness's

8

statement that she and Tenorio were hugging on the night of the incident, which upset Plaintiff because "this was a blatant lie." *Id.* at 146.

Based on Paulino's notes from her February 25 interview with Tenorio, Tenorio denied many of Plaintiff's allegations, including that he proposed having a threesome with Plaintiff earlier in the night, that he alluded to having sex with her, and that he was hugging her in the elevator. Investigation Report at 3. Regarding Plaintiff's allegation that Tenorio dragged her out of the elevator, Tenorio told Paulino that he and Plaintiff had been joking and laughing in the elevator, and that Tenorio grabbed her hand and walked out of the elevator with her, but it was not aggressive or violent. *Id.* He further denied Plaintiff's allegations that he tried to drag her to his room and that Plaintiff grabbed Tenorio's neck in an attempt to push him off of her. *Id.*

Paulino's notes from her February 25 interview with Banks reflect that Banks recalled a reference to a threesome but did not remember Tenorio stating that he wanted to have a threesome with Plaintiff. *Id.* at 4. Banks further stated that they were all having conversations about sex that night. *Id.* Additionally, Banks described Plaintiff and Tenorio as being "hugged up" in the elevator, but that it seemed mutual, and he did not recall Tenorio making any comments about having sex with Plaintiff while in the elevator. *Id.* Finally, Banks told Paulino that he recalled Tenorio pulling Plaintiff off the elevator, but did not recall Plaintiff holding onto the railing and stated that Plaintiff was laughing the whole time. *Id.*

Paulino's notes from her February 29 interview with Rawlins reflected an account similar to Banks's. Rawlins could not confirm whether Plaintiff and Tenorio

were hugging in the elevator but recalled that Plaintiff was laughing while Tenorio pulled her off the elevator from under the arms.  *Id.*; *see also* Investigation Notes at 2, ECF No. 69-24.  Rawlins said he did not see Plaintiff resist.  Investigation Report at 4.  Like Banks, Rawlins also did not recall Tenorio making any comments alluding to having sex with Plaintiff.  *Id.*

Finally, Paulino wrote that during an interview on February 27, Forrester recounted that Plaintiff told Forrester "the story about [Tenorio] grabbing her," that Plaintiff felt unsafe, and had called the police.  *Id.* at 5.  Forrester also recounted that Plaintiff had been crying during this interaction.  *Id.*

In addition to interviewing witnesses, Paulino inquired into whether Tenorio had any signs of injury from the incident.  Paulino reviewed text messages that Forrester sent Plaintiff during the flight back to JFK on February 24, stating that Tenorio had been wearing a scarf on the flight (and, as a result, she could not see his neck).  Feb. 27, 2019 emails at 7, ECF No. 69-51.  During Forrester's interview with Paulino, Forrester repeated that Tenorio had been wearing a scarf during the flight.  Investigation Report at 5.  However, Banks and Laura Salerno, who were on the February 24 return flight, told Paulino that they did not recall Tenorio wearing a scarf.  *Id.* at 4–5.  Additionally, Tenorio sent Paulino a picture that he took of himself on February 25, Mar. 2019 Emails at 3, ECF No. 69-34, which did not show signs of injury on his neck.

According to Paulino, while she was conducting witness interviews and gathering information and evidence, the Blue Watch security manager was also

attempting to obtain information regarding Plaintiff's allegations from the Holiday Inn Golden Gateway Hotel, the San Francisco Police Department, and the San Francisco District Attorney's Office.  Paulino Decl. at ¶ 13, ECF No. 69-8.  However, JetBlue was unable to obtain video footage from the hotel because there were no cameras in the elevator or on the floor where the incident took place.  Investigation Report at 6.  JetBlue was also ultimately informed that the San Francisco District Attorney's Office would not pursue charges against Tenorio.  Rule 56.1 Counterstatement at ¶ 147.

### III.    Post-Investigation Events

In an affidavit, Paulino states that based on her investigation, she

> was unable to substantiate most of Plaintiff's allegations against Tenorio, including her allegations that Tenorio had said he wanted to have a "threesome" with Plaintiff; that Tenorio had wrapped his legs around Plaintiff's legs under a table in the hotel lobby; that Tenorio had hugged Plaintiff against her will in the hotel elevator; that Tenorio made statements indicating that he intended to have sex with Plaintiff in the hotel elevator; that Tenorio aggressively pulled Plaintiff off the hotel elevator; that Tenorio lifted Plaintiff and walked toward his hotel room; or that Plaintiff scratched Tenorio's neck.

Paulino Decl. at ¶ 45.

On the other hand, Paulino was able to substantiate Plaintiff's allegation "that Tenorio had pushed or pulled her off the hotel elevator, albeit not in the violent manner alleged by Plaintiff."  *Id.* at ¶ 54.  Paulino thus recommended that JetBlue take some level of disciplinary action against Tenorio.  *Id.* at ¶ 56.  JetBlue decided to issue Tenorio discipline in the form of an Initial Guidance, which indicates that Tenorio violated JetBlue's policy and was thus not in good standing with JetBlue.  Paulino Deposition Tr. at 220:20–25, ECF No. 69-7.

Paulino attempted to contact Plaintiff on April 16 and 18, 2019 to provide her with the outcome of JetBlue's investigation and was able to connect with Plaintiff on April 23. Rule 56.1 Counterstatement at ¶¶ 161–62. Paulino told Plaintiff that JetBlue was "able to substantiate that there was some sort of touching and getting [her] out of the elevator," and that JetBlue would "take appropriate action against" Tenorio, but that JetBlue does not "discuss the outcome of what type of action [they] take with other crew members." Paulino Call Tr. at 3–4, ECF No. 69-67.

During the investigation, JetBlue had ensured that Plaintiff and Tenorio were not scheduled to work together. Rule 56.1 Counterstatement at ¶ 97. However, when Plaintiff asked Paulino during the April 23 call if she would have to work with Tenorio again, Paulino stated: "I will be transparent with you. He's not being separated from the company. We can't guarantee that you will never see him again. I know that there is an avoid list that you can try to — and I don't know if that applies to you guys if you can accommodate that, but, you know, that's not handled by us." Paulino Call Tr. at 6. Paulino told Plaintiff that she could "try to avoid" Tenorio, *id.*, and asked Plaintiff to keep her informed about the status of her criminal complaint against Tenorio, *id.* at 8.

Around that same time, Goodman — Plaintiff and Tenorio's supervisor — called Plaintiff. Rule 56.1 Counterstatement at ¶ 172. In the call, Goodman noted that "based on whatever evidence that they had, that they didn't — they could not pull it all the way through, but there was a level of something." Goodman Call Tr. at 3, ECF No. 69-65.

Paulino claims that she called Tenorio on or about April 25, 2019 and informed him about the outcome of the investigation. Paulino Decl. at ¶ 65. She then coached Tenorio regarding JetBlue's anti-discrimination and anti-harassment policies as well as the Respectful Workplace Policy, and directed him to treat Plaintiff professionally and respectfully if he ever encountered her at work in the future. *Id.* Paulino also claims that, to the best of her recollection, she informed Tenorio of JetBlue's avoid list (which allows flight attendants to avoid being scheduled to work with specific people) during that call. *Id.* at ¶ 66.

Goodman then issued Tenorio written discipline in the form of an Initial Guidance for violating JetBlue's Respectful Workplace Policy. The Initial Guidance stated that JetBlue determined Tenorio "pulled the CrewMember involved in the incident," but it "was unclear whether this was against the complainant's will or in jest as it was noted the complainant was laughing." Initial Guidance at 2, ECF No. 69-17. The guidance instructed Tenorio to "familiarize [himself] with [JetBlue's] Respectful Workplace Policy," and stated that "future instances may result in further Progressive Guidance up to and including Employment Review." *Id.*

Despite Paulino's statements to Plaintiff, Defendants allege that JetBlue did "continue[] monitoring Plaintiff's and Tenorio's schedules to ensure that they did not work together in the future." Rule 56.1 Counterstatement at ¶ 182. Plaintiff disputes this. There are emails from May 6, 2019, where Gerald Isaac (Paulino's supervisor) states that there is a request from legal to continue monitoring to ensure that Plaintiff and Tenorio are not paired to work together. Isaac Emails at 2, ECF No. 69-

32.  Isaac states: "Jamin – you did this for us initially during the investigation, can one of you continue to do so indefinitely."  *Id.*  Another JetBlue employee responded, saying: "We can monitor this — but we do not have anything in our systems that will prevent a [Crewmember] from picking up a trip with one or the other on it.  If we have to remove a [Crewmember] from the pairing, what code do you suggest we use?"  *Id.*  Isaac responded that he would bring it up to legal again soon and he "[a]ppreciate[d]" them "monitoring for now."  *Id.*  JetBlue's corporate representative testified that she was not aware of how long JetBlue continued to monitor Plaintiff's and Tenorio's pairing.  30(b)(6) Tr. at 35, ECF No. 69-11.

The parties agree that Plaintiff and Tenorio were never scheduled to work together, and never did work together, after the February 22, 2019 flight from JFK to SFO.  Rule 56.1 Counterstatement at ¶¶ 184–85.  Additionally, Plaintiff and Tenorio only saw each other once after the February 2019 incident, and Plaintiff was not subject to any discrimination, harassment, or retaliation from Tenorio or other JetBlue employees after the incident.  *Id.* at ¶¶ 186–87.  However, Plaintiff contends that based on Paulino's statements, she had to take steps to avoid working with Tenorio.  As the senior employee, she could not utilize the avoid list and could only avoid "bidding" on flight assignments after Tenorio had been assigned to those flights.  *Id.* at ¶ 183.  She says that, as a result, she "had to frantically check her flight schedule to ensure she would not be assigned to the same flight as" Tenorio and, because she had to wait to see who would be staffing a flight before bidding on it,

"was often outbid on coveted assignments, which has precluded her from hundreds of flights since February 2019." *Id.*

## PROCEDURAL HISTORY

On about June 13, 2019, Plaintiff submitted a Charge of Discrimination (No. 520-2019-04181) to the United States Equal Employment Opportunity Commission ("EEOC").  Am. Compl. at ¶ 4, ECF No. 33.  Plaintiff received a Right to Sue Letter from the EEOC on about October 8, 2019.  *Id.* at ¶ 5.  On January 6, 2020, Plaintiff filed her complaint in this action.  Compl., ECF No. 1.  Plaintiff filed an Amended Complaint on August 7, 2020, Am. Compl., alleging fifteen causes of action.

Plaintiff's Amended Complaint alleged that JetBlue discriminated against her in violation of Title VII (Count I) and NYSHRL (Count II), that both JetBlue and Tenorio discriminated against her in violation of NYCHRL (Count IV) and FEHA (Count XI), that JetBlue and Tenorio aided and abetted unlawful discrimination in violation of NYSHRL (Count III) and NYCHRL (Count V), that JetBlue interfered (Count VI) and was vicariously liable (Count VII) in violation of NYCHRL, and that JetBlue retaliated against her in violation of FEHA (Count XII).  Plaintiff also brings assault, battery, and intentional infliction of emotional distress ("IIED") claims against Tenorio under New York law (Counts VIII, IX, and X) and California law (Counts XIII, XIV, and XV).

On September 11, 2020, Defendants moved to dismiss Plaintiff's Amended Complaint.  Mot. to Dismiss, ECF No. 37.  The Court (the Hon. Rachel Kovner, District Judge) held oral argument on the motion on September 24, 2021, and, at the

end of the argument, announced an oral ruling granting in part and denying in part Defendants' motion.  Min. Entry and Order dated Sept. 24, 2021.

The Court denied Defendants' motion to dismiss Plaintiff's Title VII and NYSHRL discrimination claims, NYCHRL discrimination and vicarious liability claims, and FEHA discrimination claim because it held that Plaintiff plausibly pleaded that JetBlue failed to take appropriate remedial action after learning about Tenorio's alleged assault.  Oral Arg. Tr. at 66:15–69-13, 75:4–13, 77:7–13, 80:8–16, ECF No. 69-68; Order dated Oct. 24, 2021.  The Court granted Defendants' motion to dismiss Plaintiff's NYSHRL and NYCHRL aiding and abetting claims, but only as to Tenorio.  Oral Arg. Tr. at 76:14–79-21.  The Court also dismissed Plaintiff's NYCHRL interference and FEHA retaliation claims because Plaintiff sought to withdraw them. *Id.* at 79:22–80:7.  Finally, the Court concluded that California law, rather than New York law, governs the IIED claim and dismissed Plaintiff's New York IIED claim.  *Id.* at 82:4–7.  The Court declined to determine at that juncture whether California or New York law applies to the assault and battery claims.

The parties then proceeded to discovery.  The case was reassigned to the undersigned on October 21, 2022.  Order dated Oct. 21, 2022.  On June 7, 2023, Defendants filed a letter motion for pre-motion conference in connection with their anticipated motion for summary judgment.  Mot. for Pre-Mot. Conf., ECF No. 69.  The Court sent the parties to briefing, Order dated July 26, 2023, and the parties filed the fully-briefed motion on November 11, 2023, Mot. for Summ. J., ECF No. 76.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). A fact is material "when its resolution 'might affect the outcome of the suit under the governing law.'" *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

## DISCUSSION

Defendants make two primary arguments in support of their motion for summary judgment. First, they argue that Plaintiff's Title VII, NYSHRL, NYCHRL, and FEHA discrimination claims should be dismissed. Second, assuming the Court grants summary judgment on Plaintiff's Title VII claim, Defendants argue the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss the case in the entirety. In the alternative, Defendants separately argue that summary judgment is appropriate as to Plaintiff's NYSHRL and NYCHRL

aiding and abetting claims, and that Plaintiff's California assault and battery claims should be dismissed based on choice-of-law principles. The Court starts by addressing Plaintiff's Title VII discrimination claims and then separately addresses Plaintiff's remaining state law claims, including those brought under the NYSHRL, NYCHRL, and FEHA.

## I.      Title VII Claims

"Title VII makes it unlawful for an employer 'to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *Pollock v. Shea*, 568 F. Supp. 3d 500, 507 (S.D.N.Y. 2021) (quoting 42 U.S.C. § 2000e-2(a)(1)). As relevant here, there are two theories of discrimination "available under Title VII: disparate treatment" and "hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Defendants argue that the Court should grant summary judgment as to both Plaintiff's disparate treatment and hostile work environment claims under Title VII. First, Defendants contend that Plaintiff abandoned any disparate treatment theory of discrimination, and, in any event, there is no evidence supporting that theory. Second, Defendants argue that Plaintiff's hostile work environment theory fails because the hostile work environment created by Tenorio's alleged harassment cannot be imputed to JetBlue.

The Court agrees that Plaintiff abandoned any claims based on a disparate theory of discrimination but holds that summary judgment is inappropriate as to Plaintiff's hostile work environment theory of discrimination under Title VII.

## A.    Disparate Treatment

"A disparate treatment claim requires a showing of an adverse employment action 'either because of gender or because a sexual advance was made by a supervisor and rejected.'" *Alfano*, 294 F.3d at 373 (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992)).  Here, Defendants argue that Plaintiff abandoned any disparate treatment claim when she failed to respond to Defendants' motion to dismiss that claim.  In the alternative, Defendants contend that they are entitled to summary judgment on any disparate treatment claims.

Starting with Defendants' first argument, "courts in this circuit have held that a plaintiff's failure to respond to contentions raised in a motion to dismiss constitutes an abandonment of the applicable claim." *Bond v. City of New York*, No. 14-cv-2431, 2015 WL 5719706, at *8 (E.D.N.Y. Sept. 28, 2015).  In such circumstances, courts routinely "deem a claim abandoned" and hold that "the claim should be dismissed." *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008) (citation omitted); *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012) ("The Court thus deems the claim . . . abandoned, and the motion to dismiss it is granted."); *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) ("Consequently, because plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed.").

In their motion to dismiss, Defendants included the following footnote:

> The Amended Complaint does not assert a disparate treatment sex discrimination claim – there is no allegation that Plaintiff [] was subjected to any material, adverse employment action based on sex . . . . Indeed, Plaintiff remains employed at JetBlue without any change to the terms and conditions of her employment, and she has not alleged

19

> that anyone at JetBlue made any remarks evincing any discriminatory
> animus or identified any similarly situated comparators who were
> treated more favorably such [as] to raise a plausible inference of sex
> discrimination.  Nonetheless, should Plaintiff assert in her opposition to
> this Motion that she intended to assert such a claim, Defendants reserve
> the right to respond thereto in its reply.

Mem. in Supp. of Mot. to Dismiss at 17 n.3, ECF No. 37-1.  Plaintiff opposed

Defendants' motion to dismiss but did not address or respond to Defendants'

arguments regarding her disparate treatment claim.  Judge Kovner then noted at

oral argument on the motion to dismiss that "[a] plaintiff seeking relief for sex

discrimination can proceed either under two theories, one[] of which is a hostile work

environment, and that's the theory that plaintiff is proceeding on here."  Oral Arg.

Tr. at 56:13–16.  Plaintiff did not object to the Court's characterization of her

discrimination claim as being based solely on a theory that she had been subjected to

a hostile work environment.

Yet Plaintiff now contends that she "did not discuss in detail her sex/gender

discrimination claims in connection with Defendants' motion to dismiss in this

matter" because "Defendants[] never meaningfully sought to dismiss any such

discrimination claims."  Opp'n Br. at 20, ECF No. 76-2.  But Defendants only gave

Plaintiff's disparate treatment claim cursory treatment because they stated they did

not believe Plaintiff was proceeding on such a claim.  *See* Mem. in Supp. of Mot. to

Dismiss at 17 n.3. ("The Amended Complaint does not assert a disparate treatment

sex discrimination claim – there is no allegation that Plaintiff [] was subjected to any

material, adverse employment action based on sex").  If Plaintiff made clear in her

opposition that she "intended to assert such a claim, Defendants reserve[d] the right

to respond thereto in its reply." *Id.* Despite Defendants' express invitation to do so, Plaintiff never clarified that she was asserting a disparate treatment theory of discrimination.

After inducing Defendants not to substantively address any disparate treatment claims in their motion to dismiss briefing, and allowing the Court to confirm its understanding at oral argument that she was proceeding only on a hostile work environment theory of discrimination, Plaintiff cannot now attempt to proceed on a disparate treatment theory of discrimination. Accordingly, any disparate treatment claims are deemed abandoned. And because the Court agrees that Plaintiff abandoned this claim, it need not reach the merits of Defendants' motion for summary judgment on Plaintiff's disparate treatment theory.[1]

## B. Hostile Work Environment

Under Title VII, "[a] hostile work environment claim requires a showing (1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 373 (citation omitted). Defendants do not appear to dispute that the alleged harassment here — Tenorio's actions toward Plaintiff during their layover in San Francisco — meets the first prong of the hostile work environment analysis.

---

[1] For the same reasons, to the extent Plaintiff purports to bring claims under a disparate treatment theory of discrimination pursuant to state law, those claims are also deemed abandoned.

Instead, they contend that Plaintiff's hostile work environment claim fails at prong two because JetBlue cannot be held liable for Tenorio's harassment.

Under Title VII, the test for imputing the objectionable conduct to the employer "may depend on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "If the harassing employee is a 'supervisor,' the employer will be strictly liable for his unlawful conduct unless '(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) . . . the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.'" *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 551 (S.D.N.Y. 2014) (quoting *Vance*, 570 U.S. at 424). But where, as here, "'the harassing employee is the victim's co-worker,' [] 'the employer is liable only if it was negligent in controlling working conditions.'" *Id.*

A plaintiff can show that the employer was negligent in controlling working conditions by demonstrating that the employer "'failed to provide a reasonable avenue for complaint' or that 'it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)). Here, the parties' dispute centers on whether JetBlue took "appropriate remedial action" after Plaintiff complained to JetBlue about Tenorio's conduct.

"The appropriateness of an employer's remedial action must 'be assessed from the totality of the circumstances,'" *Turley v. ISG Lackawanna, Inc*, 774 F.3d 140, 153

(2d Cir. 2014) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998)), including "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment," *Distasio*, 157 F.3d at 65. Moreover, "[a] plaintiff does not have the right to choose an employer's remedial action." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 176 n.30 (E.D.N.Y. 2015). Rather, the action need only "be sufficiently calculated to end the harassment and [e]ven a mere written warning can be an appropriate response if it conveys the message that further harassment will not be tolerated." *Id.* (citation and quotation marks omitted). Further, "[b]ecause there are often material issues of fact about the promptness and adequacy of an employer's remedial efforts, summary judgment is frequently not appropriate." *MacMillan v. Millenium Broadway Hotel*, No. 09-cv-6053, 2011 WL 4357523, at *5 (S.D.N.Y. Sept. 16, 2011).

> Here, Defendants argue that there is no genuine dispute that JetBlue
>
> took immediate, good-faith remedial action by promptly separating Plaintiff and Tenorio and ensuring they did not work together by monitoring their flights during the company's investigation; commencing a thorough, multi-faceted investigation into Plaintiff's allegations; issuing written discipline to Tenorio and coaching him regarding the limited misconduct the company was able to substantiate; providing Tenorio with information about the company's personnel scheduling system that permitted him to avoid working with Plaintiff (which he then used); and then continuing to monitor their flights to ensure they did not work together.

Opening Br. at 29, ECF No. 76-1. Defendants further argue that JetBlue's remedial actions were clearly effective because Plaintiff never experienced further harassment from Tenorio, and only saw him one other time. *Id.*

Plaintiff, on the other hand, contends that Defendants performed an inadequate investigation and failed to take effective remedial action, in part because Paulino told Plaintiff that it was up to her to avoid working with Tenorio going forward, and JetBlue only issued Tenorio a written warning.

Defendants are correct that JetBlue was not idle after receiving Plaintiff's complaint. It promptly took Plaintiff off her scheduled flight home and made other travel arrangements for her to ensure that Plaintiff and Tenorio did not work together the day after the alleged harassment. It immediately began an investigation during which Paulino interviewed every witness with knowledge of the event, reviewed documentary evidence, attempted to retrieve surveillance footage of the incident from the hotel, and contacted San Francisco law enforcement. After the investigation, JetBlue concluded that it could only substantiate that Tenorio had pushed or pulled Plaintiff off the hotel elevator, and based on that conclusion, issued an Initial Guidance against Tenorio.

Nevertheless, a reasonable jury could conclude that JetBlue failed to take appropriate remedial action. A jury could, for example, find it unreasonable that JetBlue did not take additional steps to permanently ensure that Plaintiff and Tenorio would not work together after the incident. Based on the evidence in the record, it is not clear whether JetBlue monitored Plaintiff's and Tenorio's schedules — and if so, for how long — after the investigation terminated. Defendants argue that they did monitor their schedules, but Paulino told Plaintiff on April 23, 2019, that JetBlue could not "guarantee that [she] would never see [Tenorio] again," and

that it would be up to Plaintiff to "try to avoid" Tenorio using the so-called avoid list. Paulino Call Tr. at 5.  And while Isaac sent an email on May 6, 2019, requesting that certain JetBlue employees indefinitely monitor Tenorio and Plaintiff's "pairings to ensure they are not paired together," Isaac Emails at 2, JetBlue's corporate representative stated during her deposition that she was not aware of how long JetBlue continued to monitor their pairings after this request was made, 30(b)(6) Tr. at 35.[2]

Viewing these facts in the light most favorable to Plaintiff, there is a genuine dispute as to whether JetBlue did ensure that Plaintiff and Tenorio were not paired together for the duration of the time that they both continued to work at JetBlue.  Put differently, a jury could conclude that JetBlue did not monitor their pairings between when the investigation concluded in mid-April and when Isaac sent the email on May 6, and that the monitoring ceased at some point thereafter, and could further conclude that this was unreasonable under the circumstances.[3]

---

[2] Defendants assert in their Statement of Undisputed Facts that Tenorio was informed of and used the avoid list to ensure he would not work with Plaintiff after the investigation terminated.  Rule 56.1 Counterstatement at ¶¶ 180–81.  However, they cite to a portion of Tenorio's deposition that was not included in the exhibits filed with the Court.  Regardless, the Court need not confirm whether this fact is disputed because, even if it is true, it does not establish that JetBlue ensured Plaintiff's separation from Tenorio after the investigation — that fact would only show that JetBlue merely invited Tenorio to take measures to avoid working with Plaintiff.

[3] Defendants argue that, to the extent Plaintiff challenges JetBlue's failure to inform her of the remedial actions it took against Tenorio, that argument must fail because employers are not required to disclose their specific corrective actions to employees.  The Court concludes that, regardless of what JetBlue told Plaintiff, there is a genuine dispute as to whether its response to Plaintiff's complaint was appropriate.  Accordingly, the Court declines to reach the question of JetBlue's obligation to inform Plaintiff of its remedial measures at this juncture.

Courts have found summary judgment inappropriate as to the question of Title VII employer liability where employers responded similarly to complaints of harassment as JetBlue did here.  For example, in *Soto v. CDL (New York) L.L.C.*, No. 18-cv-5678, 2020 WL 2133370, at *13 (S.D.N.Y. May 5, 2020), the court considered whether employees' harassment could be imputed to the employer where, after learning of the incidents, the employer "attempted to discern whether there was any security camera footage of the incident," "interview[ed] the men involved to try to determine what had occurred," and "took several affirmative steps to discipline the harassers and protect Plaintiff."  While the Court found these steps "commendable," it noted that, at the summary judgment stage, the inquiry was not "whether Defendant acted promptly or took some measures, but whether a reasonable jury could find that Defendant did not respond in a reasonable manner."  *Id.* at *14.  And because "a reasonable jury could find that a reasonable response required more," the Court held that "the reasonableness of Defendant's response is best left for the jury." *Id.  See also Caban v. Richline Grp., Inc.*, No. 10-cv-559, 2012 WL 2861377 (S.D.N.Y. July 10, 2012) (where employer investigated complaints of harassment and reprimanded the assailant, "a reasonable juror could conclude that [the employer] took adequate remedial steps," or "could also conclude that [the employer's] response was inadequate.").  The same is true here; while JetBlue took certain prompt and meaningful actions in response to Plaintiff's allegations, a reasonable jury could find that more was required.

26

It is true, as Defendants argue, that Plaintiff did not experience additional incidents of sexual harassment after reporting the February incident to JetBlue, and that the cessation of sexual harassment can be strong evidence that an employer's response was effective. *See, e.g.*, *Wahlstrom v. Metro-N. Commuter R. Co.*, 89 F. Supp. 2d 506, 526 (S.D.N.Y. 2000).  But considering the facts in the light most favorable to Plaintiff, there is evidence that it was because *Plaintiff* took steps to avoid Tenorio — specifically, that she avoided working on the same flights as Tenorio — that she did not experience further harassment.  Plaintiff has also asserted that by placing the burden on her to ensure that she was not placed on flights with Tenorio, she missed out on prime opportunities to work preferred flights and routes because she waited to bid on them until she could determine whether Tenorio had already done so.  Therefore, that Tenorio's conduct ceased after JetBlue's investigation is only one factor a jury could consider, and from the totality of the circumstances, it could reasonably find that JetBlue's response was inadequate.

Accordingly, the Court denies summary judgment as to Plaintiff's Title VII hostile work environment claim.

## II.  State Law Claims

Defendants argue that if the Court grants summary judgment on Plaintiff's Title VII claim, it should decline to exercise supplemental jurisdiction over Plaintiff's various state law claims.  Given that the Court denies summary judgment as to Plaintiff's Title VII claim, that argument fails.  However, Defendants appear to argue in the alternative that the Court should grant summary judgment as to Plaintiff's

27

hostile work environment claims under NYSHRL (Count II), NYCHRL (Counts IV and VII), and FEHA (Count XI),[4] aiding and abetting claims under NYSHRL (Count III) and NYCHRL (Count V), and assault and battery claims under California law (Counts XIII and XIV).  The Court addresses each state law claim in turn.

### A.   NYSHRL hostile work environment (Count II)

In their summary judgment briefing, Plaintiff and Defendants do not make separate arguments as to Plaintiff's state and local law hostile work environment claims.  Rather, they appear to argue that Plaintiff's discrimination claims rise and fall with her Title VII claim.  The parties are correct that, "[g]enerally, Title VII actions and claims arising under the [New York] state and local laws are evaluated identically."  *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007).  However, "the NYSHRL carries a stricter standard for determining whether an employer can be held liable for an employee's conduct," *Soto*, 2020 WL 2133370, at *14, which requires the Court to separately address Plaintiff's hostile work environment claim under the NYSHRL.

Under the NYSHRL standard, "an employer cannot be held liable . . . for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it."  *Id.* (quoting *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 520 (E.D.N.Y. 2014)).  "Condonation . . . contemplates

---

[4] Defendants do not make separate arguments as to Plaintiff's NYSHRL, NYCHRL, and FEHA claims.  Rather, they generally argue that Plaintiff's hostile work environment claims fail because JetBlue took prompt, remedial action in response to Plaintiff's complaint.  Because the standards for each claim are not identical, the Court addresses each cause of action separately.

a knowing, after-the-fact forgiveness or acceptance of an offense.  Alternatively, an employer's calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation."  *Id.* (citations and quotation marks omitted).  But "a good-faith response to address misconduct precludes a conclusion that an employer has condoned misbehavior even if reasonable people could find that response insufficient."  *M.H. v. Starbucks Coffee Co.*, No. 22-cv-10507, 2023 WL 5211023, at *5 (S.D.N.Y. Aug. 13, 2023).

Here, there is no dispute that JetBlue took some action in response to Plaintiff's complaint.  And while, as discussed above, "reasonable people could find that response insufficient," *id.*, Plaintiff does not point to evidence indicating that JetBlue's response was in bad faith.  This case is thus different in kind from those in which courts have held there is a genuine dispute as to whether the NYSHRL liability standard is met.  In those cases, employers ignored reports of sexual harassment, *Brown v. City of New York*, No. 11-cv-2915, 2013 WL 3789091, at *13 (S.D.N.Y. July 19, 2013), told complainants "that they did not believe them," and "fail[ed] to remove [the assailant] from further interactions with female employees," *Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d at 522–23, and conducted an investigation of the purported sexual harassment that "was so ineffective that it was meaningless," *Hill v. Child.'s Vill.*, 196 F. Supp. 2d 389, 401 (S.D.N.Y. 2002).  In other words, "courts have found that an employer condones harassment (and thus becomes a party to it) only where the employer either takes no action in response to accusations or where any action

29

taken is alleged to have been in bad faith." *Starbucks Coffee Co.*, 2023 WL 5211023, at *5.

Here, JetBlue interviewed all witnesses with knowledge of the incident, took notes on each witness interview, took steps to collect evidence from the hotel and San Francisco law enforcement, and took some disciplinary action against Tenorio. And even though Plaintiff disagreed with the outcome of the investigation as well as the nature of its post-investigation remedial actions, there is no evidence that JetBlue conducted the investigation itself in bad faith. Thus, a reasonable jury could not conclude that JetBlue encouraged, condoned, or approved of Tenorio's conduct. Accordingly, the Court grants Defendants' motion for summary judgment on Count II.

## B.    NYCHRL hostile work environment (Count IV)

While courts have described the NYCHRL's standard for imputing liability to an employer as a more demanding one than under Title VII, *see, e.g., Erasmus v. Deutsche Bank Americas Holding Corp.*, No. 15-cv-1398, 2015 WL 7736554, at *8 (S.D.N.Y. Nov. 30, 2015), the two standards contain similar language. Under the NYCHRL,

> [a]n employer may be liable for discriminatory behavior by an employee only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; . . . or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

30

*Id.* (citing N.Y. City Admin. Code § 107(13)(b). Plaintiff does not argue that Tenorio "exercised managerial or supervisory responsibility," and there is no dispute that JetBlue "knew of [Tenorio's] discriminatory conduct." *Id.* Therefore, the question is whether JetBlue "acquiesced in such conduct or failed to take immediate and appropriate corrective action." *Id.*

For the reasons discussed *supra* at 21–27 with respect to Plaintiff's Title VII claim, a reasonable jury could find that JetBlue's response was not "appropriate" under the circumstances. Accordingly, the Court denies summary judgment as to this claim. *Cf. Swiderski v. Urb. Outfitters, Inc.*, No. 14-cv-6307, 2017 WL 6502221, at *9 (S.D.N.Y. Dec. 18, 2017) (concluding that a genuine factual dispute existed as to whether liability could be imputed to the employer under the NYCHRL standard but granting summary judgment "[u]nder the stricter NYSHRL standard").[5]

## C.     FEHA hostile work environment (Count XI)

"Under both Title VII and FEHA, '[a]n employer is liable for a co-worker's sexual harassment only if, after the employer learns of the alleged conduct, he fails to take adequate remedial measures.'" *Steinmetz v. Golden State Supply, Inc.*, No. 07-cv-6155, 2008 WL 11336824, at *6 (C.D. Cal. Apr. 15, 2008) (quoting *Kohler v.*

---

[5] The Court notes that Plaintiff brings both a direct claim of liability against JetBlue under NYCHRL (Count IV) as well as a claim for vicarious liability (Count VII). Even if Plaintiff had grounds to plead these claims in the alternative, it appears that she cannot now proceed with both. "To maintain a separate cause of action for vicarious liability would be duplicative here where Plaintiff already brings claims for discriminatory conduct against [JetBlue]." *Scott v. YSB Servs. Inc.*, No. 21-cv-7711, 2024 WL 1330043, at *7 (S.D.N.Y. Mar. 28, 2024). If the case proceeds to trial, Plaintiff will need to advise Defendant and the Court which claim she will voluntarily dismiss or provide this Court with authority establishing that she can proceed with both claims at trial.

*Inter-Tel Techs.*, 244 F.3d 1167, 1176 (9th Cir. 2001)).   The test for imputing objectionable conduct to the employer is thus the same under Title VII and the FEHA, and Defendants' motion for summary judgment on Count XI is denied for the reasons discussed *supra* at 21–27.

### D.   NYCHRL and NYSHRL aiding and abetting (Counts III and V)

The NYSHRL and NYCHRL both "provide that '[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'" *Sanchez v. L'Oreal USA, Inc.*, No. 21-cv-3229, 2022 WL 1556402, at *5 (S.D.N.Y. May 17, 2022) (quoting N.Y. Exec. § 296(6) and citing N.Y.C. Admin. Code § 8-107(6)).   Courts "apply the same standard to evaluate both claims." *Id.*   To be liable under those provisions, "an individual employee must have 'actually participated in the conduct giving rise to the claim.'" *Scott v. YSB Servs. Inc.*, No. 21-cv-7711, 2024 WL 1330043, at *6 (S.D.N.Y. Mar. 28, 2024) (quoting *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004)).   New York courts have held that "a failure to conduct a proper and thorough investigation or to take remedial measures upon a plaintiff's complaint of discriminatory conduct is sufficient to impose liability on an aiding and abetting theory." *Ananiadis v. Mediterranean Gyros Prod., Inc.*, 151 A.D.3d 915, 918 (2017).   Moreover, NYSHRL and NYCHRL liability "must first be established as to the employer/principal before an individual may be considered an aider and abettor." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009) (citation omitted).

Plaintiff argues that because JetBlue did not adequately respond to Tenorio's alleged assault, it can be held liable for aiding and abetting Tenorio's sexual harassment.  Defendants respond that a corporate employer cannot be liable for aiding and abetting a hostile work environment violation by its employee.

Defendants are correct.  Courts have stated that "[i]t is well established that a corporate defendant cannot 'aid and abet' its own discriminatory conduct."  *Scott*, 2024 WL 1330043, at *7.[6]  "Similarly, a corporate employer cannot be liable for aiding and abetting a hostile work environment violation by its employee, because such a claim would be derivative of the primary hostile work environment claim against the corporate employer."  *Rossbach v. Montefiore Med. Ctr.*, No. 19-cv-5758, 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021).  In other words, a corporate defendant "cannot be liable as an aider and abettor under either NYCHRL or NYSHRL because [its] alleged participation in the conduct giving rise to the underlying violation would be the basis for just that claim — an underlying violation of NYCHRL or NYSHRL."  *Sanchez*, 2022 WL 1556402, at *6.  The Court thus grants summary judgment on Plaintiff's aiding and abetting claims against JetBlue.

### E.    California assault and battery (Counts XIII and XIV)

Plaintiff brings assault and battery claims under both New York and California law.  In Defendants' motion, they argue that "dismissal of Plaintiff's

---

[6] Plaintiff cites one case, *Benzinger v. NYSARC, Inc. N.Y.C. Chapter*, 385 F. Supp. 3d 224, 239 (S.D.N.Y. 2019), where a court found a corporate defendant liable under NYCHRL's aiding and abetting provision.  However, because the *Benzinger* court reached this conclusion by relying on precedent recognizing individual supervisory liability, the Court declines to rely on it.

California state law assault and battery claims . . . is warranted, pursuant to fundamental choice-of-law principles, given that they do not conflict with Plaintiff's New York law assault and battery claims and are otherwise duplicative." Opening Br. at 34 n.15. Because Plaintiff did not address this argument in her opposition brief, the Court directed Plaintiff to file any opposition to the dismissal of her California assault and battery claims on or before June 14, 2024, and advised that if she fails to do so, "the Court will consider Defendants' motion as to the California claims unopposed." Order dated June 6, 2024. To date, Plaintiff has not filed any such opposition.

The Court construes Plaintiff's silence as a concession that New York law applies to her assault and battery claims, which "is sufficient to avoid a conflict of laws analysis." *Freeman v. Jacobson*, No. 20-cv-10040, 2021 WL 3604754, at *9 (S.D.N.Y. Aug. 13, 2021). Accordingly, the Court dismisses Plaintiff's California assault and battery claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment as to Counts II, III, and V, and DENIES Defendants' motion as to Counts I, IV, and XI. The Court further concludes that Plaintiff abandoned any disparate treatment discrimination claims and may not proceed with them at trial and dismisses Counts XIII and XIV.

SO ORDERED.

_/s/ NRM_ _____

NINA R. MORRISON
United States District Judge

Dated: July 9, 2024
        Brooklyn, New York